UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| JAMES V. KELLY; CRESCENT BAR CONDOMINIUM MASTER ASSOC., et al., | NO. CV-11-023-JLQ |
| Plaintiffs, | **ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| vs. | |
| PUBLIC UTILITY DISTRICT NO. 2., et al., | |
| Defendants. | |

BEFORE THE COURT is Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 211). The Motion is unopposed, except as to two issues: 1) the duration of the injunction and 2) the proposed amount of the bond. The parties have had an extended time to submit briefs. Having considered the matter, the court **GRANTS** Plaintiffs' Motion.

**I.    *BACKGROUND***

Plaintiffs allege the following:

In 1955, FERC issued a 50-year license to the Public Utility District No. 2 of Grant County to operate the Priest Rapids Hydroelectric Project on the Columbia River. Crescent Bar Island ("the Island") is an island located in the Columbia River within the project boundaries.

*1962 PUD-Port Lease.*    In 1962, the PUD entered into a lease of the Island to the Port of Quincy for "public and recreational purposes" which lease was scheduled to terminate in fifty-years in 2012  ("PUD-Port lease"). The 1962 PUD-Port lease included a provision incorporating by reference the terms and conditions of the 1955 FERC license.

ORDER - 1

*1970 Port-Crescent Lease*. In 1970, the Port subleased a portion of the island to the predecessor of Crescent Bar, Inc. ("Crescent"), which sold leasehold interests to members of the public for the development of recreational homes and condominiums on the island.   The Complaint alleges that in 1973 the Port-Crescent lease was modified to expressly extend the term of Crescent's leasehold from 2012 to February 28, 2023 because of the financing requirements of the contemplated improvements to the Island.

Thereafter, the PUD and Port are claimed to have entered into an amendment extending the term of the 1962 PUD-Port lease to 2023, subject to FERC approval.  That agreement stated the parties would "promptly...submit" their proposed extended sublease for approval of FERC.  ECF No. 46, Ex. B.  The Complaint further alleges that in 1975, the Port, with approval of the PUD, entered into an agreement which identified a dispute between the parties regarding the term of the Crescent lease.

*1979 Lease*. In 1979, the PUD, the Port and Crescent are alleged to have entered into a new lease (replacing all prior agreements), which included a term providing that the PUD, Port, and Crescent "reaffirm their desire to extend the term of the June 5, 1962 and this Lease Agreement until February 28, 2023," subject to FERC approval.  ECF No. 40, Ex. B at 31. The 1979 lease also stated that **"Application to the [FERC] for approval....shall be required..."**  Id. at 34.  The Port also agreed that upon request, it would exercise "reasonable diligence" to get an extension of its lease with the PUD in order to give Crescent a fifty(50)-year extension of its lease term.  ECF No. 40, Ex. B, at 48-49.

Plaintiffs allege that over the next two decades, the PUD expressed its commitment to the lease extension and its agreement to seek FERC approval of the extension. Though FERC has apparently not to date formally approved any lease extension terms, CBI private residential units were constructed and interests sold.  Plaintiffs are condominium leasehold owners and condo associations who have made substantial investments in CBI.

In 1999, FERC determined in an Order that "after 1965, all leases of projects lands needed Commission approval" and that subsequent subleases purporting to extend the term to 2023 "have not received commission approval." ECF No. 40, Ex. E. In a footnote of that decision, the Commission noted that the PUD "has long been aware of the need for Commission approval of its lease agreements..." In 1973, the Commission apparently declined to approve the lease terms beyond the term of the existing license. Though the Commission changed its policy in 1980 to allow approval of leases extending beyond the license term, the PUD did not subsequently seek Commission approval of the lease extension.

*2008 FERC License*. In 2005, the PUD's FERC license was to expire. In 2003, the PUD applied for a new license. In 2008, FERC granted the PUD a new forty-four (44)-year license. The 2008 License requires the PUD to develop and submit a final Shoreline Management Plan ("SMP"). In April 2010, the PUD submitted to FERC a SMP which would eliminate residential use of CBI after 2012. Plaintiffs have intervened in the FERC proceeding to challenge the PUD proposed SMP. The FERC proceeding regarding the SMP is ongoing.

The PUD and the Port have ordered Plaintiffs to vacate the premises on or before June 1, 2012.

Based on the foregoing, Plaintiffs filed this lawsuit claiming that by contract and/or promissory estoppel, they have the right to maintain and occupy their residences at least until 2023. Plaintiffs claim the PUD and the Port have breached their agreement to obtain FERC approval to ensure the 1979 lease was extended to 2023 and that promissory estoppel bars them from terminating the 1979 lease and evicting Plaintiffs prior to 2023. Plaintiffs also claim the PUD and the Port have violated the Fifth and Fourteenth Amendments of the U.S. Constitution. Plaintiffs seek injunctive relief to prohibit the Defendants from evicting them.

On December 27, 2011, the court entered a Temporary Restraining Order enjoining the Defendants from proceeding "with the eviction of Plaintiffs and/or their members"

ORDER - 3

pending a preliminary injunction hearing. On January 23, 2012, Plaintiffs timely filed their Motion for Temporary Restraining Order and Preliminary Injunction.  ECF No. 211.

**II. *DISCUSSION***

The court has already entered a Temporary Restraining Order (TRO) in this matter pursuant to Fed.R.Civ.P. 65(b).  ECF No. 188.  The purpose of a TRO is "preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing [on the preliminary injunction application], and no longer." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423 (1974); *see also Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1130–31 (9th Cir.2006).   The standard for issuing a Preliminary Injunction is essentially the same as that for issuing a Temporary Restraining Order.  *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001).

A plaintiff seeking a Preliminary Injunction must establish (1) likely success on the merits; (2) likely irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). Under the "sliding scale" approach to preliminary injunctions observed in the Ninth Circuit, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) *(citing Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003)). "[A]t an irreducible minimum," though, "the moving party must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation." *Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2009).

Defendants do not concede the merits of Plaintiffs' Motion, though they are not opposed to the entry of the Preliminary Injunction because they believe this dispute will be resolved by arbitration.

ORDER - 4

**A. Likelihood of Success of the Merits**

Plaintiffs have analyzed each of their claims' likelihood of success. Plaintiffs contend they are likely to prevail on their contention that the PUD and Port breached their agreements to extend their leases to a 2023 term and breached their duties of good faith to take actions necessary to obtain FERC approval of the extension. Plaintiffs contend the PUD chose not to seek FERC approval of the extension, despite their contractual obligation to do so, on which Plaintiffs relied. Plaintiffs also claim they are likely to succeed on their breach of contract and promissory estoppel claims against the Defendants. Plaintiffs' claim the PUD, by promising to approve and obtain lease extensions to 2023 created a contract and breached that contract when they rejected that position. Plaintiffs claim further breaches of its promises by the PUD when it notified the Port, CBI, and Plaintiffs that their leases would expire and they would be evicted. Likewise, Plaintiffs assert the Port breached its agreement by deciding to evict Plaintiffs instead of honoring its agreement to extend their leases and by failing to pursue the promised lease extensions with FERC. Finally, Plaintiffs contend they are likely to succeed on their claim that the Port and PUD have violated their substantive and procedural due process rights under the Fifth and Fourteenth Amendments by interfering with Plaintiff's property rights in an irrational and arbitrary manner.

The Port responded briefly to Plaintiffs' showings stating that Plaintiffs' claims "face multiple barriers including at least the plain language of the lease documents, the parties multiple efforts, over decades, to extend the lease, the collateral estoppel effects of prior FERC decisions, and the statute of limitations." ECF No. 224 at 2. Although the court can only surmise the precise nature of these defenses, none are so plainly meritorious so as to undermine the fact that there are questions serious enough to require trial, if necessary. The court notes the doctrine of collateral estoppel does not preclude litigation of a question not within FERC jurisdiction, and could only apply potentially to issues which are in substance the same. It is alleged that the PUD has never sought FERC approval of the Plaintiffs' continued residential use of Crescent Bar Island through

2023 as allegedly promised and the court is not aware of a FERC decision on this precise issue.  As for the statute of limitations, this is a commonly asserted defense in cases involving decades of relevant conduct. However, Plaintiffs assert their claims accrued in 2010 when Defendants rejected the 2023 lease term and took actions contrary to the 1979 lease and its promises to seek FERC approval.

Based on the unopposed Motion and appraising the Plaintiffs' claims as presented to the court, the court finds the Plaintiffs have shown a likelihood of success on the merits and have established there are questions "serious enough to require litigation."

**B. Likelihood of Irreparable Harm**

Plaintiffs' contend the denial of their motion would cause immediate, irreparable injury.  The PUD and Port have ordered the eviction of Plaintiffs on or before June 1, 2012.  Plaintiffs would lose their property, homes, and businesses.  The Plaintiff associations claim an eviction would destroy "their essential purpose and ultimately cause their dissolution."  The loss of real property, because it is unique, is an irreparable injury. *Sundance Land Corp. V. Community First Federal sav. And Loan Ass'n.*, 840 F.2d 653 (9th Cir. 1988).

**C. Balance of Equities and Public Interest**

The court finds that the balance of equities and public interest elements both demonstrate that the issuance of a Preliminary Injunction is appropriate. As Plaintiffs point out, the public interest is served by keeping people in their homes and keeping businesses in operation.  For forty years, the Defendants observed and apparently encouraged the development of the Island.  Not until 2010, did the PUD shift its position of the continued residential occupation of the Island.  Given the great potential impact of eviction and the promises made by Defendants regarding an extension to 2023, the proposed injunction should have been a clearly predicted consequence of the current positions of the Defendants.   Any potential impact on the Defendants  would be nominal in comparison to the potential impact of an eviction of the Plaintiffs from their homes and businesses, especially where the PUD's stated intent was allegedly to alter the current

ORDER - 6

uses of the Island.  Furthermore, given the unopposed nature of this Motion to preserve the status quo, the court finds the balance of hardships and the public interest is in favor of the Plaintiffs.

**D. Bond Amount**

Rule 65(c) of the Federal Rules of Civil Procedure provides that a district court may grant a Preliminary Injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The court retains continuing discretion as to the amount of bond, if any, but should consider the realistic likelihood of harm to an enjoined party when considering the amount of the bond. *Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011). The "bond amount may be zero if there is no evidence the party will suffer damages from the injunction." *Connecticut General Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003).  The burden of establishing the amount of bond necessary to secure against the wrongful issuance of an injunction rests with the Defendant. *See e.g., Doctor's Assocs. v. Stuart*, 85 F.3d 975, 985 (2d Cir.1996) (suggesting burden on defendant to support claim for bond).

The PUD stipulates to the issuance of the injunction without imposition of a bond. ECF No. 223 at 3.  Plaintiffs argue that no bond is necessary as they (and CBI) will continue to pay rent to the Port according to a formula provided for by contract. Plaintiffs suggest that if they are required to post a bond, the court should impose no more than $13,632.27, the amount of quarterly rent paid by CBI to the Port. ECF No. 230.

The Port asks the court to impose a bond in the amount of $826,500 per month, or alternatively, impose as a condition in the injunction that the Port would be absolved of any liability for "holdover rents" in the event Plaintiffs' tenancies are determined to expire in 2012. Such a bond would obviously be confiscatory in nature compared to the rent currently paid under the lease.  The Port did not cite any authority or produce any evidence with its Response to support the its contention that it might suffer damages

caused by the injunction. However, on March 13, 2012, without obtaining leave of court, counsel for the Port filed a supplemental declaration attaching a letter from the PUD received after the Response was filed. The letter, dated February 28, 2012, from the PUD to the Port Commissioners states that "it is the PUD's position that the 1962 Lease expires on June 1, 2012" and

> [t]herefore, commencing on June 2, 2012, PUD will be entitled to one of the following from PORT until PUD has possession and control of the property leased by PUD to PORT under the 1962 lease:
> (1) Holdover damages under Washington law equal to (a) the reasonable rental value of the demised property in amounts averaging $2800 per month for each condominium and $1700 per month for each RV space, or the reasonable rental value of the demised property as determined by appraisal, if higher than that set forth in this subparagraph; and (b) reimbursement to PUD for all costs for required infrastructure, including upgrading of sewer, fire prevention systems, water systems, and electrical systems, paid by PUD after June 2, 2012, until PUD has possession and control of the demised property; or
> (2) Should the 1962 lease be determined to extend beyond June 1, 2012, PUD will be entitled to reasonable rental values and reimbursement for infrastructure costs paid as set forth in Section (1) above.

ECF No. 245 at 9-10.

While there is nothing wrong with advising a party of the PUD's legal position, ignoring that there is ongoing litigation and conducting itself as if the merits of this case have already been decided in its favor is inappropriate. This type of conduct also tends to create aggravation rather than move the dispute toward an appropriate resolution.

In determining the amount of a security bond, the court must consider the potential damages arising *from the operation of the injunction itself, not from damages occasioned independently of the injunction*. Here, the costs and damages that would be sustained by the Defendants, if the PUD and Port were to have had the right all along to terminate the tenancies on the Island despite its alleged promises, are limited to the delay (after June 1, 2012) in returning possession of the Island to the PUD. Any resulting minimal delay does not present any realistic likelihood of harm to the Port (or the PUD), especially given that Plaintiffs will continue occupying the real property while making their rent payments. The fact that the PUD itself does not seek the imposition of any bond suggests that the PUD does not perceive a risk of any imminent damages from the injunction.

ORDER - 8

1    Moreover, a party who fails to oppose an injunction is unlikely to be entitled to
2    compensation for damages caused by the provisional relief it consented to. *See e.g.*, *Page*
3    *Communications Engineers, Inc. v. Froehlke*, 475 F.2d 994 (C.A.D.C. 1973 (refusing to
4    impose liability on an injunction bond considering the equities in the case where
5    defendants did not diligently oppose the preliminary injunction).
6           As there is no evidence damages are likely to arise from the injunction, the court
7    will not require that a bond be posted. However,  the court will include a condition
8    mandating the continued payment of the current rent pending further order of the court.
9    **E. Duration of the Injunction**
10           Finally, the parties disagree as to whether the Defendants should be enjoined
11   pending the resolution of the case or pending an arbitration decision.  In a typical
12   injunction, acts are enjoined pending the resolution of the merits of the case.  Sometimes,
13   injunctions are tied to the resolution of related proceedings.  In this case, there is no
14   evidence the parties have actually scheduled an arbitration, only that Defendants have
15   apparently invoked an arbitration provision.  As arbitration proceedings have not yet
16   commenced, the Preliminary Injunction duration will not be tied those proceedings,
17   although the court encourages the commencement of arbitration or mediation.  Should
18   there be a mediation or arbitration decision impacting this case, the parties may ask the
19   court to modify, lift,  or reconsider the injunction.
20   **F. Scope of the Injunction**
21           The court notes the Plaintiffs ask that the injunctive relief in this case run to the
22   benefit of non-parties including "other persons or business entities having leases by,
23   through, or under Crescent [Bar, Inc.]" ECF No. 211 at 5.  Plaintiffs have submitted
24   declarations of business owners whose businesses (golf course pro shop, a restaurant, a
25   retail shop, vacation rental business) are used by and rely upon the Island residents.
26   Neither the PUD, the Port, or Crescent Bar, Inc have opposed that proposed scope of the
27   injunction.
28

ORDER - 9

**III.** *CONCLUSION*

The court finds Plaintiffs have demonstrated that a Preliminary Injunction is warranted in this case. For the reasons stated above, the court GRANTS Plaintiff's Motion for a Preliminary Injunction. The court hereby orders as follows:

1. The following injunction is entered to preserve the status quo and prevent irreparable harm pending a determination of the action on the merits or further order of the court.

2. Pending a determination of the merits of Plaintiffs' claims herein, the PUD, Port, and Crescent Bar, Inc., their agents, servants, employees, representatives, and all persons acting in concert or participating with them are enjoined from terminating the existing leases ; evicting, disturbing the peace and quiet enjoyment of, or engaging in any other conduct that directly or indirectly adversely impacts the quiet enjoyment, use, or possession of the Port, Crescent Bar, Inc., Plaintiffs, or other Crescent Bar, Inc. leaseholders.

3. It is unnecessary for Plaintiffs to post a separate bond. The beneficiaries of this injunction Order shall continue paying the current rent throughout the course of this litigation.

DATED this 29th day of March, 2012.

s/ Justin L. Quackenbush<br>
JUSTIN L. QUACKENBUSH<br>
SENIOR UNITED STATES DISTRICT JUDGE

ORDER - 10